[S. F. No. 18232. In Bank. Mar. 13, 1951.]

LOUIS L. SANGUINETTI, Respondent, v. MOORE DRY DOCK COMPANY, Appellant.

Williamson & Wallace, Brobeck, Phleger & Harrison, Wallace, Garrison, Norton & Ray and Moses Lasky for Appellant.

Dion R. Holm, City Attorney, Edmond P. Bergerot and George E. Baglin, Deputy City Attorneys, Jennings & Belcher, and Betts, Ely & Loomis, as Amici Curiae on behalf of Appellant.

Hoberg & Finger, Henry G. Sanford and John H. Finger for Respondent.

SCHAUER, J.—Defendant appeals from a judgment rendered against it in plaintiff's action, brought under the Jones Act (46 U.S.C.A. § 688)[1], to recover for injuries suffered by him while employed as the operator of defendant's tugboat, the "Moore No. 2." We conclude that by reason of the misconduct of counsel in moving in the presence of the jury, at the close of plaintiff's evidence, to amend the complaint by increasing the amount prayed for as damages, which motion was subsequently granted by the trial court, and the fact

---

[1] "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right of remedy in cases of personal injury to railway employees shall apply. . . ."

thereof brought to the attention of the jury, the judgment must be reversed.

The tugboat, 45'10" in length and 12'9" wide, was used to tow other craft, to place barges alongside hulls under repair at defendant's shipyards in the Oakland Estuary, and to go where needed around San Francisco Bay. When the tug was not in use, plaintiff did rigging work in the yard. He testified that his 40-hour work week was divided into approximately 24 hours as master of the tugboat and 16 hours as rigger; his hourly rate of pay was greater as tugboat operator than as rigger. His orders came from the rigging department. Plaintiff sometimes handled the tug alone and at other times was assisted by a deckhand.

On May 2, 1947, plaintiff, pursuant to orders, took the tugboat from defendant's Oakland yard to Pier 18 in San Francisco, picked up a 66' derrick barge loaded with scrap steel, and towed the barge back to the Oakland yard where the steel was unloaded. The barge was then to be docked at a pier a short distance away. Plaintiff testified that while the tug was in motion during the docking operations, it became necessary, because of a faulty clutch on the tug, for him to jump back and forth from the tug to the barge. In so doing he lost his balance and his left leg was pinned between the tug and the barge as they swung together, and was badly crushed.

Defendant's first contention on appeal is that plaintiff was not a seaman entitled to sue under the Jones Act, but was rather a harbor worker whose exclusive remedy is under the Longshoremen's and Harbor Workers' Compensation Act (44 Stat. 1424, ch. 509; 33 U.S.C.A. §§ 901, 905). That act provides in section 902, however, that "(3) The term 'employee' does not include a master or member of a crew of any vessel . . .," and in section 903 that ". . . No compensation shall be payable in respect of the disability or death of—— (1) A master or member of a crew of any vessel . . ."

Defendant's counsel in his opening statement declared that plaintiff "was the operator in charge of the tug, and he was in law what would be called a 'master,' although in connection with tugs, it is normally called an operator . . ."

■ At the time plaintiff was injured he was actively engaged as master in navigating the tug and was "naturally and primarily on board to aid in her navigation" (*South Chicago Coal & Dock Co.* v. *Bassett* (1939), 309 U.S. 251, 260 [60 S.Ct. 544, 84 L.Ed. 732]). It thus appears that, as

plaintiff asserts, under the holding of the case just cited and of *Warner* v. *Goltra* (1934), 293 U.S. 155, 159 [55 S.Ct. 46, 79 L.Ed. 254], and *Norton* v. *Warner Co.* (1944), 321 U.S. 565, 571-572 [64 S.Ct. 747, 88 L.Ed. 931], he is as master excluded from the coverage of the Workers' Compensation Act, and is entitled to maintain this action. *Moore Dry Dock Co.* v. *Pillsbury* (1938), 100 F.2d 245, relied upon by defendant, concerned a deckhand who was drowned while engaged in repairing a tugboat while she was tied up at the dock, and is not decisive here.

Defendant next contends that plaintiff's counsel committed misconduct in moving, in the presence of the jury, to amend the prayer of the complaint to ask $75,000 instead of $50,000 in damages, and that such misconduct when followed by the action of the court, after argument without the jury's presence, in granting the motion, resulted in such prejudice to defendant as to require reversal of the judgment.

The record discloses the following proceedings in the jury's presence at the close of plaintiff's case:

"MR. HOBERG [Counsel for Plaintiff] : . . . Plaintiff will rest but asks leave to amend the complaint to increase the amount in the prayer from $50,000 to $75,000 incurred and to be incurred on the evidence that has been submitted here before the Court and jury.

"MR. RAY [Counsel for Defendant] : I desire to argue that matter in chambers and reserve the right at this time to move for a mis-trial upon the grounds of plaintiff's misconduct in connection with the motion.

"THE COURT: Well, I will hear that matter out of the presence of the jury."

The jurors were then dismissed, and the following proceedings had:

"THE COURT: Now, then, in regard to this motion to amend the complaint, have you any authority there, or do you want to let it go over until tomorrow?

"MR. HOBERG: There is no question about this, your Honor. I have done it a hundred times.

"THE COURT: It is done every day here, but I don't know whether in raising the amount—whether that is a matter that should have gone in outside of the presence of the jury."

After argument the court granted plaintiff's motion, defendant thereupon renewed his motion for a mistrial on the ground of misconduct of plaintiff's counsel in presenting the motion in the jury's presence, and the court denied defend-

ant's motion. Defendant then presented its evidence, and the case went to the jury with an instruction, among others, that "The damages must be reasonable and cannot be in excess of the amount alleged in the complaint, namely $75,-000." The jury retired from the courtroom, and 35 minutes later returned with a verdict for plaintiff in the sum of $75,000.

No California decision directly in point has been cited or discovered by our research. ■ It is, of course, the rule in this state that the jury may be instructed as to the maximum verdict which may be returned, as was done here. (*Lahti* v. *McMenamin* (1928), 204 Cal. 415, 421 [268 P. 644]; see, also, *McNulty* v. *Southern Pacific Co.* (1950), 96 Cal. App.2d 841, 853 [216 P.2d 534].) In *Buswell* v. *City & County of San Francisco* (1948), 89 Cal.App.2d 123, 133 [200 P.2d 115], in discussing defendant's point that a permitted amendment to increase the prayer had not been "formally made to the complaint," the court mentions that "At the end of the trial and in the *absence of the jury,* plaintiffs moved to amend the complaint to conform to the proof by increasing the prayer . . . Defendant vigorously objected. The court granted the motion." (Italics added.) The point before us in the instant case was thus not involved in Buswell. In *Duffey* v. *General Petroleum Corp.* (1949), 93 Cal. App.2d 757, 758-759 [209 P.2d 986], it is stated that "At the *beginning of the trial,* on October 19, 1948, plaintiffs' counsel moved to amend the complaint by increasing the amount of the alleged damage to $4,000, and the motion was granted. Defendant interposed an objection to the amendment, but did not ask for a continuance of the trial by reason thereof. The jury returned a verdict for $4,000." (Italics added.) No discussion of the point here at issue appears in the opinion.

In several New York cases the impropriety of moving, in the jury's presence, for permission to increase the amount sought in the prayer of the complaint is discussed and the practice condemned. Thus, in *Kenney* v. *South Shore Natural Gas & Fuel Co.* (1908), 126 App.Div. 236 [110 N.Y.S. 503, 504-505], a personal injury action, "After the selection of the jury, and *before any evidence had been taken,* plaintiff moved to amend her complaint by changing the amount asked in her prayer for relief from $10,000 to $25,000. Defendant's counsel duly objected, and the court reserved its decision thereon. The evidence on both sides had been practically

completed before the court passed upon the motion, and allowed the amendment asked for." The verdict was for $20,000. On appeal the judgment was reversed, with the following observations by the court: "It seems that the court on the trial of an action may, in the proper exercise of its discretion, permit plaintiff to amend his complaint by increasing the amount of damages demanded. [Citations.] . . . [But] we do not think such an amendment can properly be permitted . . . [without] explaining why application for the privilege had not previously been made . . . [and] some reason showing the propriety of the amendment . . .

". . . the record now before us . . . discloses no reason for granting the motion, unless the action of the court thereon was influenced by the evidence produced on the trial as to the extent and nature of plaintiff's injuries. . . . [nor] is there . . . in the statement of the court on granting the motion, a suggestion of a reason why such an amendment was asked for at that time, nor why it was then granted . . . As the motion was *made in the presence of the jury,* and the court *held its disposition thereof until after the evidence was concluded,* it is at least probable that the jury may have been to some extent influenced in arriving at the unusually large verdict awarded by the, perhaps unwarranted, assumption that the court, after hearing the evidence, concluded that plaintiff had shown herself entitled to larger damages than she had at first demanded in her complaint, and that the court's favorable action on the motion was due to that fact." (Italics added.)

In *Sandresky* v. *Erie R. Co.* (1915), 91 Misc. 67 [153 N.Y.S. 612, 613], "At the opening of the trial, without an affidavit of the plaintiff, the latter was permitted to amend his complaint, increasing the demand for damages . . ." for personal injuries. After pointing out that the plaintiff had failed to explain why he had delayed until trial his motion to amend, and that the rule called for denial of the motion under such circumstances, the court concluded, "We think the present case is within the rule, and that it was error to permit the plaintiff to amend the complaint *in the presence of the jury,* and that because of this error the judgment should be reversed, with costs, unless the plaintiff is willing to stipulate that the damages shall be reduced to come within the cause of action originally pleaded." (Italics added.)

In *Walker* v. *Bradt* (1929), 225 App.Div. 415 [233 N.Y.S. 388, 391], the following appears: ''Appellant's contention that the court erred in permitting plaintiff during the trial to increase the demand in her complaint from $3,000 to $6,000 is without merit. We are satisfied that this was *not done in the hearing of the jury,* and the amount of the verdict was less than $3,000.'' (Italics added.)

In *Pfeil* v. *Klein* (1936), 247 App.Div. 510 [286 N.Y.S. 721, 722], a personal injury action, the court said: ''Plaintiff gave no intimation of any claim of damage, beyond $3,000, until the case was fully tried and the jury had been charged, and then asked to amend the complaint so as to demand $20,000 damages. This motion was denied, and then the court granted a motion to conform the pleadings to the proof. The verdict was for $8,000.

''The effect of the granting of the motion to conform the pleadings to the proof was to conform the pleading to whatever verdict the jury might find, and this, occurring, as it did, *in the presence of the jury,* carried the implication that the court thought that the proof warranted a verdict larger than $3,000. This caused prejudice to defendants, which requires a reversal. [Citing the *Sandresky* and *Kenney* cases, *supra.*]

''Had the verdict been $3,000 or less, no harm would have been done. *Blackwell* v. *Finlay* [1922], 233 N.Y. 361, 364, 135 N.E. 600; *Walker* v. *Bradt* [*supra*] . . .'' (Italics added.)

In *Blackwell* v. *Finlay,* cited in *Pfeil* v. *Klein, supra,* ''Plaintiff, an attorney . . . , brought suit to recover the reasonable value of services rendered by him to defendant. . . . The jury found for the plaintiff . . . and rendered a verdict in his favor for $10,000 . . . , which was the amount demanded in the complaint.'' In affirming the judgment the court commented (p. 364 of 233 N.Y.): ''At the close of the evidence the plaintiff was permitted to amend his complaint by alleging that the value of his services was $17,000 and demanding judgment for that amount. If the verdict had been for more than the amount originally demanded, it might have been urged that this was an abuse of discretion and that the trial judge was without power to permit the amendment. We agree, however, . . . that defendant was not prejudiced. He was not contesting the value of the services as originally alleged in the complaint.''

And in *Sohman* v. *Metropolitan St. Ry. Co.* (1907), 56 Misc.

342 [106 N.Y.S. 1033], in denying defendant's motion to set aside a verdict on the ground of surprise, the court states, "The amendment of the complaint by increasing the amount of damages claimed was granted at the close of the case after all the evidence was before the court. The argument was made in the absence of the jury, which had left the courtroom by direction of the presiding justice, and in accordance with his instructions no mention was made of the granting of such motion by counsel in summing up to the jury."

In the Missouri case of *Prichard* v. *Dubinsky* (1935), 338 Mo. 360 [89 S.W.2d 530, 531], in rejecting defendant's contention that "the court should not have permitted plaintiff to amend the petition at the close of the evidence by increasing the $10,000 prayed for as damages to $20,000," it is pointed out that "The amendment was not made in the presence of the jury." (See, also, *Hinchliffe* v. *Wenig Teaming Co.* (1916), 274 Ill. 417 [113 N.E. 707, 708].)

◼ Regardless of the lack of California authority on the precise point at issue, we are convinced that any practice which would include the making of a motion, in the presence of the jury, after production of evidence, to increase the amount of damages asked, and which would bring to the knowledge of the jury the fact that the court after hearing plaintiff's evidence permitted the complaint to be amended by increasing the prayer for damages, should be unhesitantly condemned and stricken down. As commented in *Starr* v. *United States* (1894), 153 U.S. 614, 626 [14 S.Ct. 919, 38 L.Ed. 841], quoted in *Bollenbach* v. *United States* (1946), 326 U.S. 607, 612 [66 S.Ct. 402, 90 L.Ed. 350], "It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." (See, also, *Vaughan* v. *Magee* (1914, 3 Cir.), 218 Fed. 630, 631 [134 C.C.A. 388].) ◼ It is, of course, elementary that the amount of damages is ordinarily a question of fact to be determined by the jury. (See 8 Cal.Jur. 877, § 119, and cases there cited.)

◼ Plaintiff urges that in any event defendant could not have been prejudiced by what occurred, inasmuch as the court also instructed the jury generally that they were the sole judges of the evidence, they were not to be influenced on factual issues by any action of the court, that they were the sole judges of any damages to be awarded, and that any such

damages must be reasonable.[2] Plaintiff also points out that defendant makes no contention that the jury's verdict is disproportionate to the injuries sustained by plaintiff. But regardless of the possible effect (or lack of effect) of this fact in a case based on California law, it cannot be decisive here where issue was joined not only on the *amount* of injuries sustained but also (under the Jones Act) on the *proportionate responsibility* (comparative negligence) of the parties, and where, upon the state of the evidence, a large measure of discretion rests with the jury.

Defendant specifically resisted plaintiff's claim of damages, on the ground that plaintiff's injuries were proximately caused by his own negligence rather than that of defendant, and on the further ground that if any negligence of defendant

---

[2] Such instructions include the following: "You will distinctly understand that in this charge the Court is in no manner or form expressing, or desires to express, any opinion on the weight of the evidence, or any part thereof; nor does the Court express any opinion as to the truth or falsity of the testimony of any witness; nor does the Court in any manner or form express its opinion that any alleged fact in this case is or is not proven. With questions of fact, the weight of evidence, the credit that you should give to any witness sworn in the case, the Court has nothing to do. These are matters entirely within your province, and which you, as jurors, under your oaths, must determine for yourselves. . . .

"If the judge of this Court has at any time during this trial used any language, or has seemed to you to indicate the opinion of the judge as to any question of fact, or as to the credibility of any witness, you must not be influenced thereby, but must determine yourselves all questions of fact without regard to the opinion of anyone else.

"The Court charges you that you are not to use in the consideration or determination of any facts in the case any reference to or comment on the evidence which may have been made by the Court during the course of the trial, in connection with the admission of testimony or otherwise. The determination of the facts of the case is solely within your province, and you are not to be assisted or influenced in any way by anything which the Court may say or do in that behalf. . . .

"It is for you alone to judge of the credibility of the witnesses, the weight to be given the evidence offered, and its effects, and its conclusiveness, to establish any fact for which it has been offered. . . .

". . . I, of course, do not know whether you will need instructions on the measure of damages, and the fact that they have been given to you must not be considered as intimating any opinion of my own on the issue of liability or as to which party is entitled to your verdict. . . .

"You are instructed that the law prescribes no definite measure of damages, but the law leaves such damages to be fixed by you as your discretion dictates and as, under all the circumstances, may be just and proper. It is not necessary, therefore, that any witness should have expressed an opinion as to the amount of such damages, if any, sustained by plaintiff, but it is for you, the ladies and gentlemen of the jury, to make such estimate of the damages, if any, from all of the facts and circumstances revealed by the evidence, and by considering them in connection with your own knowledge and experience in the affairs in life."

were found to have proximately contributed to such injuries, then the damages to be assessed should be reduced by the jury under the comparative negligence doctrine which applies under the Jones Act. (See *The J. H. Hillman* (1939), 108 F.2d 231; *Stewart* v. *United States* (1928), 25 F.2d 869.) Substantial evidence was introduced by defendant in support of its position. Assuming that plaintiff had shown injuries for which $75,000 would constitute fair compensation he is, nevertheless, not entitled to recover $75,000 from defendant if plaintiff's own negligence contributed proximately and in any substantial degree to those injuries. In such event it would be the duty of the jury to compare the negligence of plaintiff with that of defendant and to award plaintiff only that proportion of $75,000 which defendant's negligence bears to "the entire negligence attributable to both the plaintiff and the defendant." (*Haskins* v. *Southern Pac. Co.* (1934), 3 Cal.App.2d 177, 191 [39 P.2d 895].) This is not, therefore, a case in which the error can be said to be nonprejudicial because the issues were resolved on undisputed or overwhelming evidence. (See *Blanton* v. *Curry* (1942), 20 Cal.2d 793, 813 [129 P.2d 1]; *Anderson* v. *Hagen* (1937), 19 Cal.App.2d 714, 726 [66 P.2d 168]; *Wilkerson* v. *City of El Monte* (1936), 17 Cal.App.2d 615, 623 [62 P.2d 790] (Hrg.Den.).) As often emphasized by this court (see e.g., *Anthony* v. *Hobbie* (1945), 25 Cal.2d 814, 817-818 [155 P.2d 826]) "The issues of negligence and proximate cause are essentially questions of fact." Likewise is the question of comparative negligence essentially one of fact, and because that question is ordinarily resolved by the jury only by awarding a lump sum to the plaintiff, which sum must constitute reasonable compensation for his injuries less such proportion of the reasonable compensation as may be attributable to his own fault, the likelihood of prejudice from an error such as that which we have here is intensified.

 Under the circumstances we find no reasonable basis for holding that defendant was not prejudiced by the jury's knowledge that the court had permitted plaintiff to ask for $75,000, rather than $50,000, "incurred and to be incurred on the evidence that has been submitted here before the Court and jury," especially when consideration is given to the further fact that, as defendant points out, the "jurors retired, elected a foreman, reached a verdict, filled in the form of verdict, had it signed by the foreman, notified the bailiff, the bailiff notified the court, the court notified counsel, and the

jury returned to the courtroom, all in 35 minutes.''

The situation here, in legal effect, is basically comparable to that in *Oettinger* v. *Stewart* (1944), 24 Cal.2d 133, 140 |148 P.2d 19, 156 A.L.R. 1221], which prompted the court to say, ''In cases where it clearly appears that the jury did not rely upon the erroneous instructions, the judgment may be affirmed on the ground that the error is not prejudicial. This, however, is not such a case. Neither the evidence of contributory negligence nor of negligence, although sufficient as a matter of law, can be said to be convincing, and we should not speculate upon the basis of the verdict.'' To the same effect see, also, *Pipoly* v. *Benson* (1942), 20 Cal.2d 366, 375 [125 P.2d 482, 147 A.L.R. 515] ; *People* v. *Dail* (1943), 22 Cal.2d 642 [140 P.2d 828] ; *Intagliata* v. *Shipowners & Mer. etc. Co.* (1945), 26 Cal.2d 365, 382 [159 P.2d 1] ; *Clement* v. *State Reclamation Board* (1950), 35 Cal.2d 628, 643 [220 P.2d 897]. We think that the implications of prejudice are at least as strong in a case such as this as in any of the cases cited.

In *Berguin* v. *Pacific Elec. Ry. Co.* (1928), 203 Cal. 116, 118-121 [263 P. 220], it was held that comments by the trial court in the jury's presence which indicated his doubt of the necessity of helping the injured plaintiff to the witness chair, were prejudicial and constituted reversible error. The opinion comments (pp. 120-121), that ''It needs no citation to convince any unbiased observer that a jury has both ears and eyes open for any little word or act of the trial judge from which they may gather enough to read his mind and get his opinion of the merits of the issues under review. . . . The above error must, therefore, be held sufficient in and of itself under the circumstances of this case to compel a reversal of the judgment. . . .'' (See, also, *People* v. *Williams* (1860), 17 Cal. 142, 147; *People* v. *Mahoney* (1927), 201 Cal. 618, 626-627 [258 P. 607] ; *People* v. *Frank* (1925), 71 Cal.App. 575, 581-582 [236 P. 189] ; *People* v. *Robinson* (1946), 73 Cal.App.2d 233, 237 [166 P.2d 17] ; *Citti* v. *Bava* (1928), 204 Cal. 136, 138-139 [266 P. 954] ; *Steele* v. *Wardwell* (1943), 57 Cal. App.2d 642, 648-652 [135 P.2d 628], in which the appellate court commented, ''This was a close case and the statements made by the court may well have been the determining factor. In our opinion, the entire case should be reversed . . .''; *Anderson* v. *Hagen* (1937), 19 Cal.App.2d 714, 726 [66 P.2d 168], in which the court reversed, saying, ''Because the evidence on this vital point was in direct conflict, the error of admitting this [hearsay] testimony cannot be said to be with-

out prejudice''; *Curtis* v. *McAuliffe* (1930), 106 Cal.App. 1, 8 [288 P. 675] ; *Taylor* v. *Aetna Life Ins. Co.* (1933), 132 Cal.App. 434, 439 [22 P.2d 775].)

█ Plaintiff urges that the trial court's action in denying defendant's motions for mistrial and for new trial, made upon the ground of misconduct of plaintiff's counsel in moving to amend in the presence of the jury establishes the absence of prejudice to defendant (see *Cope* v. *Davison* (1947), 30 Cal. 2d 193 [180 P.2d 873, 171 A.L.R. 667].) However, as held in *Citti* v. *Bava* (1928), *supra*, 204 Cal. 136, 140, ''While it is true that the conclusion of the trial court on the motion for a new trial is entitled to much consideration its decision thereon is not conclusive on appeal.''

There is no contention that the making and granting of the motion, under the circumstances shown, can be justified as a permissible request for, and making of, comment on the evidence. (See Cal. Const., art. VI, § 19.)

The judgment is reversed and the cause remanded for a new trial.

Shenk, J., Edmonds, J., and Spence, J., concurred.

GIBSON, C. J., and Traynor, J.—We dissent.

It is our opinion that this case was correctly decided by the District Court of Appeal and that the judgment should be affirmed for the reasons set forth in the opinion of that court by Justice Goodell. (98 A.C.A. 423, 220 P.2d 398.)

CARTER, J.—I dissent.

The majority decision by four justices of this court reaches a new low in search for a reason to reverse a judgment abundantly supported by evidence and based upon the unanimous verdict of a jury. That judgment was approved by a most learned, fair, careful, experienced and able trial judge, and affirmed by the unanimous decision of a District Court of Appeal composed of three learned and able justices with many years of trial and appellate court experience. (*Sanguinetti* v. *Moore Dry Dock Co.*, 98 A.C.A. 423 [220 P.2d 398].) Four members of this court (a majority) have reached a decision diametrically opposed to that reached by seven other members of the judiciary—the trial judge, three District Court of Appeal justices and three members of this court. That a miscarriage of justice will result from this decision is apparent from a review of the record before this court, but

the detriment to our system for the administration of justice from the effect of this decision will far outweigh the loss to plaintiff who is denied justice in this case. The decision reached here by these four justices strikes a lethal blow at the very heart of our judicial system—trial by jury. It holds, in effect, that a jury may not be informed as to the state of the pleadings in a civil action. This is contrary to all authorities on the subject. While the majority concede that it is not error for the jury to be informed as to the amount claimed in the prayer of the complaint, they hold that it is *incurable misconduct amounting to reversible error* if a motion to amend the complaint for the purpose of increasing the amount prayed for is made in the presence of the jury. There is not a scintilla of reason or common sense in such holding. It is so lacking in consideration of the realities of the situation that it may be said to be naive. In 26 years of practice before the courts of this state, I heard many such motions made and granted in the presence of the jury, and in none of those cases did the jury award the increased amount prayed for. No question was ever raised by either court or counsel as to the propriety of such practice, as no one ever thought that anyone could be misled thereby, it being well understood among lawyers and laymen alike that a demand for damages is not evidence that plaintiff is entitled to damages in any sum whatsoever. The fact that in this case the jury awarded the increased amount prayed for is no indication that they were influenced by the motion which they heard or the ruling of the court thereon which they did not hear. Although the majority opinion so implies, jurors are not fools. Even if they are not lawyers, they have much more intelligence than the majority opinion indicates. They are entitled to know, and should be informed, at the beginning of the trial the amount plaintiff is seeking to recover. It certainly would have been proper for either the court or counsel to inform the jury at the beginning of the trial that plaintiff was claiming $50,000 damages. And, as the majority seem to concede, if the motion to amend had been made out of the presence of the jury, it would have been proper for the court to have advised the jury at the close of the case, as it did, that they could not return a verdict in excess of $75,000, the amount then claimed. Is the conclusion not inescapable that the jury then must know that plaintiff had amended his complaint by increasing his demand? But, suppose a juror did not know how or why the amount of the demand had been increased, and made in-

quiry of the court, could the court not say that plaintiff had moved to amend his complaint by increasing the amount prayed for, and the court had allowed such amendment? To say that such statement is not permissible is to make ostriches out of jurors, or place them behind an "iron curtain," a practice which should not be countenanced in any enlightened system for the administration of justice. The reactionary philosophy of the majority opinion is so out of harmony with present day concepts of trial procedure that it resembles some of the skeletons of the dead past, when conservative minded judges found such technical and finespun reasons for reversing judgments based upon jury verdicts, that the people of this state were constrained to adopt section 4½ of article VI of our Constitution, imposing upon appellate courts the requirement of determining that any error committed by a trial court must have resulted in a miscarriage of justice before reversing a judgment based upon a jury verdict. The liberal concept of this constitutional provision has evidently not impressed the majority of this court, as there is no suggestion in the majority opinion that a miscarriage of justice resulted from the alleged error in this case.

It is conceded by the majority that their decision is not supported by a single decision of any court of this state. It seems logical that an unprejudiced mind seeking to rationalize the absence or lack of such decisions during a period of over 100 years of the judicial history of this state, and the further fact that the statutory law of the state is silent on the subject, would conclude that the practice of making such motions in the presence of the jury had never heretofore been considered improper or cause for assignment of misconduct or error. It should be apparent to every unprejudiced mind, as it is to me, that the majority, in seizing upon this motion as the sole ground for a reversal of the judgment in this case, is simply creating a mythical error which exists only in hypertechnical illusion. Certainly, with the widespread practice of making such motions in the presence of the jury— well known to trial lawyers throughout the state—some appellate court at some time during the history of the state would have been called upon to hold such practice error if there was the slightest basis for such holding.

Furthermore, if such practice were as deadly and vicious as the majority opinion indicates, it is more than probable that the public liability insurance companies and utilities would have instructed their lobby group to prevail upon the

Legislature to enact legislation prohibiting such practice. That this has not occurred is persuasive evidence of the recognized propriety of such practice.

To my mind the majority decision in this case is an abuse of the judicial process. We have here four judges, without precedent or authority, announcing a rule contrary to the practice which has prevailed throughout the history of the state, and contrary to the holding of seven equally trained and experienced judges. What these four judges have done here is in direct conflict with the view expressed by Mr. Justice Cardozo in his work entitled "The Nature of the Judicial Process." He there declared, at page 112: "My analysis of the judicial process comes then to this, and little more: logic, and history, and custom, and utility, and the accepted standards of right conduct, are the forces which singly or in combination shape the progress of the law. Which of these forces shall dominate in any case, must depend largely upon the comparative importance or value of the social interests that will be thereby promoted or impaired."

What these four judges have done here is likewise contrary to the philosophy expressed by Judge Salmond at pages 192-193 of the 10th edition of his work on Jurisprudence, where he said: "Where, then, do courts derive those new principles, or *rationes decidendi*, by which they supplement the existing law? They are in truth nothing else than the principles of natural justice, practical expediency, and common sense. Judges are appointed to administer justice—justice according to law, so far as the law extends, but so far as there is no law, then justice according to nature."

In essence, what these four judges have done here, is to blindly announce a court-made rule which not only finds no support in history, precedent, experience, custom, practice, logic, reason, common sense or natural justice, but is in utter defiance of each and all of these standards.

I shall now proceed to demonstrate the fallacy of the holding of the majority in this case.

Section 473 of the Code of Civil Procedure provides:

"The court may, in furtherance of justice, and on such terms as may be proper, allow a party to amend any pleading or proceeding by adding or striking out the name of any party, or by correcting a mistake in the name of a party, or a mistake in any other respect; . . . The court may likewise, in its discretion, after notice to the adverse party, allow,

upon such terms as may be just, an amendment to any pleading or proceeding in other particulars; . . ."

As was said in *Isaacson* v. *Union Trust Co.*, 95 Cal.App. 633, 638 [273 P. 119], "The matter of the allowance of trial amendments to the pleadings rests in the sound discretion of the court, and such ruling should not be disturbed upon appeal in the absence of a showing that prejudice resulted therefrom to the extent that the party aggrieved was deprived of a substantial right or placed in a position where it may be said that he was deprived of a fair trial." (See, also, *Unruh* v. *Kauffman*, 205 Cal. 238, 244 [270 P. 440] ; *Duffey* v. *General Petroleum Corp.*, 93 Cal.App.2d 757, 759 [209 P.2d 986] ; 21 Cal.Jur. 181). Further, "It is the settled law of this state that motions to amend pleadings to the end that justice may be promoted are to be liberally granted." (*Rabe* v. *Western Union Tel. Co.*, 198 Cal. 290, 299-300 [244 P. 1077] ; *Klopstock* v. *Superior Court*, 17 Cal.2d 13, 19 [108 P.2d 906, 135 A.L.R. 318] ; *Carter* v. *Lothian*, 133 Cal. 451, 452 [65 P. 962] ; *McDougald* v. *Hulet*, 132 Cal. 154, 162 [64 P. 278] ; *Crosby* v. *Clark*, 132 Cal. 1, 8 [63 P. 1022] ; *Guidery* v. *Green*, 95 Cal. 630, 633 [30 P. 786].) The same rules are applicable to amendments increasing the amount of damages alleged. (*Duffey* v. *General Petroleum Corp.*, *supra*; *Hoffman* v. *Southern Pacific Co.*, 101 Cal.App. 218, 229 [281 P. 681].) It has also been held that the right to amend should not be denied merely because the new matter to be added may have been known to the applicant at the time of filing his original pleading. (*Tolbard* v. *Cline*, 180 Cal. 240, 245 [180 P. 610] ; *Kroplin* v. *Huston*, 79 Cal.App.2d 332, 340 [179 P.2d 575].) Moreover, an amendment increasing the damage claim does not change the cause of action stated. (*Babcock* v. *Jewell*, 110 Cal.App. 323, 325-326 [294 P. 30].)

Defendant asserts that the trial court abused its discretion in granting the motion to amend because defendant was thereby surprised and prejudiced. This contention is predicated upon the assertion that defendant's liability insurance was limited to $50,000, the original amount of the prayer, and accordingly "the insurance company had been the sole party in interest" prior to the amendment. This argument is also utterly devoid of merit. Two days prior to the making of the motion, the attorney supposedly representing defendant was informed that it would be made. While defendant's request for a continuance was denied, no good reason for granting it appears.

Defendant's attorney informed the court at that time that he knew he was supposed to proceed with defendant's case and he stated that defendant's witnesses were present. The increased prayer, as heretofore shown, did not change the cause of action and it did not inject any new issue into the case. Any arrangement between defendant and its insurance carrier as to the conduct of the litigation could not possibly affect plaintiff's right to amend.

Since the granting of the motion to amend would be a proper exercise of discretion by the trial court, the sole question is whether, under the circumstances here, the making of that motion in the presence of the jury constituted prejudicial misconduct requiring a reversal of the judgment.

Section 657 of the Code of Civil Procedure authorizes the granting of a new trial for:

"1. Irregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial; . . ."

Under this section, then, the alleged misconduct of counsel, in order to warrant a reversal of a judgment and the granting of a new trial, must be such as to have denied a fair trial to the complaining party. (*Robinson* v. *Western States Gas & Elec. Co.,* 184 Cal. 401, 407 [194 P. 39] ; *Langford* v. *Kosterlitz,* 107 Cal.App. 175, 186 [290 P. 80] ; *Mullanix* v. *Basich,* 67 Cal.App.2d 675, 686 [155 P.2d 130] ; *Gerberich* v. *Southern California Edison Co.,* 26 Cal.App.2d 471, 476 [79 P.2d 783] ; *Coppock* v. *Pacific Gas & Elec. Co.,* 137 Cal.App. 80, 90 [30 P.2d 549].) It is also elementary that a trial judge is in a better position than an appellate court to determine whether a verdict resulted wholly, or in part, from the asserted misconduct of counsel and his conclusion in the matter will not be disturbed unless it is plainly wrong. (*Cope* v. *Davison,* 30 Cal.2d 193, 203 [180 P.2d 873, 171 A.L.R. 667] ; *Walling* v. *Kimball,* 17 Cal.2d 364, 368-369 [110 P.2d 58] ; *Lafargue* v. *United Railroads,* 183 Cal. 720, 724 [192 P. 538].) As was said in *Hatfield* v. *Levy Brothers,* 18 Cal.2d 798, 814 [117 P.2d 841], "A denial of a motion for new trial made upon the ground of misconduct of counsel, although not binding on this court, is entitled to great weight upon an appeal in which complaint is made of the misconduct." Here, the trial court denied motions for mistrial and for a new trial based upon the asserted misconduct of plaintiff's attorney.

Viewed in the light of these principles, then, the majority decision is that the action of counsel for plaintiff had the effect of denying a fair trial to defendant and the rulings of the trial court to the contrary, giving them the great weight to which they are entitled, were plainly wrong. I do not believe that there is any misconduct involved in the action of plaintiff's attorney. In my opinion this contention does not even present a substantial question worthy of extended discussion by an appellate court. But even assuming the existence of misconduct, it is impossible to conceive how *any* prejudice to defendant could have resulted, especially in view of the evidence, the instructions and the rulings of the trial court on the question.

Plaintiff's case was based upon the theory that defendant was negligent in maintaining the tug engine with a defective clutch and that this negligence was the proximate cause of plaintiff's injuries. Plaintiff testified that shortly after he became the tug operator for defendant in September, 1945, he discovered that the clutch would stick so that he could not shift from forward speed. When this happened he would sometimes have to leave the pilot house and go down to the engine room to disengage the clutch. He could not shut off the engine from the pilot house. He reported the clutch difficulties to Acosta, the plant engineer in charge of maintenance and repairs. He also spoke to Acosta about getting an entirely new engine, including a clutch. Acosta considered such a purchase but decided against it. Although plaintiff requested it, no work was done on the clutch when the tug was taken out of the water in January, 1947, to repair the propeller. The clutch difficulties increased in February and April of 1947. Knapp, the general superintendent of defendant company, told plaintiff that they were not going to spend any more money on the ''Queen Mary.''

Annalla and Hagstead, who worked as deck hands on the tug, also testified as to difficulties with the clutch.

Plaintiff also testified that the clutch again stuck on May 2, 1947, while the tug was being used to bring a barge from San Francisco. Plaintiff called to Annalla to come into the pilot house and take the wheel. He then went down to the engine room and turned the clutch control there. Both Annalla and Pestano, the crane operator on the derrick barge, corroborated plaintiff's account of this incident.

Plaintiff further testified that, subsequently on the same day, while he was attempting to dock the barge at the 8th

Street pier on the Oakland side of the bay, the clutch stuck once more. The tug was then about 12 to 15 feet from the barge, coming in at a slight angle toward it at a speed of about two or three knots per hour. Plaintiff was unable to shift into neutral. He did not have time to go down to the engine room as he was afraid that the tug would ram into an oil tank and cause an explosion. He thought that the best thing to do in order to stop the tug was to throw a line on the barge and jump over to secure it. When the tug was about two or three feet away from the barge, plaintiff threw a looped line (called a spring or breast line) on the barge and jumped over to the barge at the same time. He was off balance from this fast movement and his legs slipped over the side of the barge. His left leg was pinned between the barge and the tug as the tug came in and that leg was crushed. He finally pulled himself up on the deck of the barge. (He did *not* testify that he jumped back and forth from the tug to the barge.) The forward motion of the tug was stopped by the rope that plaintiff had managed to get over a bit on the barge. He testified that, but for the faulty clutch on the tug, he would not have jumped from the tug to the barge. He did not have time to shout to the deck hand (who was then on the barge). There was no other eyewitness testimony of the accident.

Pestano, the crane operator, did not see the accident. He heard plaintiff shout for help and found him with both legs hanging over the side of the barge. The tug was then about two feet away from the barge and was tied to the barge by the spring line described by plaintiff.

Annalla was on the barge and did not witness the accident. He found plaintiff dangling over the side of the barge. The spring line was then fastened between the barge and the tug. This line was ordinarily used to pull a barge into dock and it was his, Annalla's, job as deck hand to handle this rope. After the accident he went aboard the tug and shut off everything.

Knapp, the general superintendent, testified that plaintiff had told him that the tug needed a new engine. He knew that there was trouble with the clutch and he discussed that with plaintiff (although he also testified that he did not recall specific complaints about the clutch). The engine was old and obsolete and the purchase of a new one had been considered. Plaintiff was not required by any rules of the company to keep the tug in repair. Acosta, the plant

engineer, was the person in charge of such matters. After the accident the clutch was taken out of the tug and repairs were made on it.

Acosta testified that he was in full control of repairs of equipment in the yard in 1947. He talked to plaintiff a number of times about the general condition of the Moore No. 2, but he did not recall specific complaints about the clutch. After the accident, when the clutch was repaired, it showed only normal wear. Some parts were replaced. He did not find anything which, in his opinion, would cause the clutch to stick. (The marine shop foreman gave the same opinion.)

The testimony of Exter, a foreman of defendant's marine machinists in 1947, was that plaintiff had told him of the clutch sticking. Exter would take complaints to Acosta as he could not do anything without a work order from the latter. The tug was not operated between the time of the accident and the time the clutch was taken out and repaired. When they took the clutch cover off they could see that the bushings and gears were badly worn and that there was a great deal of slack in the pins and rods which operated the clutch from the pilot house.

Forrest, a marine machinist employed by defendant, stated that he found the clutch in bad shape after the accident and he had it taken completely out and sent it to the shop. After the clutch was restored to the tug, he checked it and it did not look safe to him. He thought that the clutch would still stick. He did some more work on it and thereafter the clutch functioned properly.

Dr. Wagner, an orthopedic surgeon, gave the only medical testimony. He began treating plaintiff after October 4, 1947. The X-ray pictures show fractures of the tibia of the left leg which extend into the ankle joint. The union of the upper and lower fragments of the tibia will not be complete for several more months. There is an irregularity of the ankle joint due to the fractures which is called an "overlapped foot." Such a condition is generally progressive. A marked deossification can be seen.

The clinical treatment of plaintiff was also described. The cast was kept on the left leg until December, 1947. The leg was bandaged until about February, 1948. Then a foot drop brace was applied which has a spring action designed to force the foot upwards into a normal (right angle) position. Plaintiff was constantly in pain during this period. The brace did not force the foot back into a normal position and the foot is

now permanently deformed as a result of the injury and deossification. Plaintiff cannot move his foot upwards at all. He lacks about 50 degrees of normal movement of the left foot. If he walks at all it will be with a limp.

Plaintiff is slowly recovering from a paralysis of the peroneal nerve and there is a permanent weakness and wastage of the muscles in the left leg.

The only operations possible are an amputation of the left foot or a fusing of the ankle joint, making it rigid. The pain will grow worse, but plaintiff should avoid either of these operations until the pain becomes so severe and is combined with so much limitation of activity that an operation becomes absolutely necessary. He will have to wear the leg brace continuously unless an operation is performed.

The disability is such that plaintiff ''will not be able to return to any duty that requires constant standing or walking, or any physical effort such as climbing or doing overhead work. He should not engage in any activity that would require walking on rough surfaces, or do anything which calls for the correct maintenance of one's balance.'' His walking capacity, as to distance, is very limited. (Plaintiff set the limit at about two blocks and stated that he cannot walk at all without severe pain.)

Plaintiff testified that he is 33 years of age and is married. In addition to his employment with defendant as a tug operator and a rigger, he has worked as a commercial fisherman and on a pile driver. He knows no other occupations. His education was halted when he was in the eighth grade. His wage as a tug operator was $1.80 per hour, but the wage scale has since been raised. His wages for the last four weeks prior to the accident totalled $407.46. During the past 8 or 9 months plaintiff has been working in a radio shop, taking care of it when the mechanic goes out on calls. His earnings from this vary from $5 to $20 a week, depending upon the time the store is left in his care.

There is evidence that the life expectancy is 36.12 years for a white male of plaintiff's age. The amount required to pay a person of that age the sum of $250 a month until he is 65 years of age, computing the interest at 2 per cent, would be $64,048. If the interest rate were $2\frac{1}{2}$ per cent, the necessary amount would be $60,055. The sum of $56,430 would be required if the interest rate were 3 per cent. There is testimony that insurance companies would guarantee an interest rate of between 2 per cent and $2\frac{1}{2}$ per cent.

Defendant gave no evidence on the subject of damages. In his opening statement, defendant's counsel stated that the existence of injuries was conceded and the only question for the jury was whether defendant was liable therefor.

The instructions to the jury contained the following:

"You will distinctly understand that in this charge the Court is in no manner or form expressing, or desires to express, any opinion on the weight of the evidence, or any part thereof; nor does the Court express any opinion as to the truth or falsity of the testimony of any witness; nor does the Court in any manner or form express its opinion that any alleged fact in this case is or is not proven. . . . (Q)uestions of fact . . . are matters entirely within your province. . . .

"If the judge of this Court has at any time during this trial used any language, or has seemed to you to indicate the opinion of the judge as to any question of fact . . . you must not be influenced thereby, but must determine yourselves all questions of fact without regard to the opinion of anyone else. . . .

"You will be instructed on the subject of the measure of damages in this action, because it is my duty to instruct you as to all the law that may become pertinent in your deliberations. *I, of course, do not know whether you will need instructions on the measure of damages, and the fact that they have been given to you must not be considered as intimating any opinion of my own on the issue of liability or as to which party is entitled to your verdict.* . . .

"You are instructed that the law prescribes no definite measure of damages, but the law leaves such damages to be fixed by you as your discretion dictates and as, under all the circumstances, may be just and proper. . . .

"*The damages must be reasonable and cannot be in excess of the amount alleged in the complaint, namely $75,000.00.* . . .

"You are instructed that if your verdict is in favor of the plaintiff, then in fixing damages you should award such amount as will compensate for the injuries sustained, if any, including such amount as will compensate for the pain and suffering endured. . . .

"If you believe from the evidence that the injuries sustained by the plaintiff are permanent in their character, then you will take into account the period of time in the future during which he will be expected to suffer such pain, humiliation, disfigurement, or disability, if any. . . ." (Emphasis added.)

The jury was also fully and fairly instructed on the elements of damages and the subjects of negligence, contributory negligence, comparative negligence and proximate cause.

The motion to amend the prayer of the complaint was argued and granted in chambers. And although the jury was never informed of the court's action on the motion, the majority opinion intimates that the jury could infer from the emphasized instruction, naming the amount of plaintiff's claim, as increased by the amendment, that the motion was granted, that the granting of the motion indicated the trial judge's belief that the evidence warranted a larger recovery than that originally claimed, and that it is possible that the jury disregarded all the other explicit instructions and returned a verdict based upon this double inference. The foregoing review of the evidence and instructions demonstrates that this asserted possibility is devoid of reality, and is the result of fantastic speculation by the majority, who utterly ignore the determination of the trial court that defendant suffered no prejudice as a result of the motion or instruction.

The majority opinion states that prejudice to defendant must have occurred from the asserted misconduct because the doctrine of comparative negligence was involved in this action and for the further reason that the jury returned its verdict within 35 minutes after the case was submitted to it. No reason is stated, and I am unable to find any reason, why the jury should have taken more time to resolve the simple factual issues presented. The only real disputed question as to a probative fact was whether or not the clutch was defective. Although considerable evidence was received during the trial, most of it was directed to that issue.

Neither is there any explanation as to how the presence of the comparative negligence doctrine indicates prejudice to defendant. Even if it be assumed that the jury could infer from the instructions that the motion to amend the prayer was granted and that this was done because the trial judge believed that the evidence of plaintiff's injuries would justify a larger verdict, *there is nothing whatsoever upon which an inference could be based that the court believed that plaintiff was entitled to recover at all.* As heretofore quoted, the jury was specifically charged that instructions on the subject of the measure of damages were given so that the instructions would completely state the law applicable to the issues in the case, and that "the fact that they (instructions on damages) have been given to you must not be considered as intimating

any opinion of my own on the issue of liability or as to which party is entitled to your verdict." Moreover, the motion to amend was made at the close of plaintiff's case and before the introduction of any evidence by the defendant, that is, before the trial judge had any knowledge as to the merits of defendant's case contesting its liability.

The evidence also indicates that the crucial and decisive question in the case was whether or not defendant negligently maintained defective equipment. The principal defense was lack of negligence—lack of *any* responsibility for the serious injuries admittedly suffered by plaintiff. Plaintiff introduced substantial, if not overwhelming, evidence in support of his position on this point. Even the witnesses for defendant conceded that the tug engine was obsolete and in need of some repairs. It is apparent that the jury was entitled, if not compelled, to find in favor of plaintiff on the matter of defendant's negligence. There was little, if any, evidence tending to show *any* contributory negligence on the part of plaintiff. The nature of the case is such that it is highly improbable that the jury could have believed plaintiff's evidence concerning defendant's negligence while at the same time rejecting plaintiff's evidence as to his lack of contributory negligence. There was no dispute as to the nature and extent of plaintiff's injuries, the extent and duration of his disability, the degree to which his earning power was impaired, or the amount of pain and suffering caused by the injuries. The verdict is not excessive in view of this evidence. (See *McNulty* v. *Southern Pacific Co.*, 96 Cal.App.2d 841, 846-851 [216 P.2d 534], and cases cited.)

The majority opinion states: "This is not . . . a case in which the error can be said to be nonprejudicial because the issues were resolved on undisputed or overwhelming evidence." It is obvious that this statement is not based upon anything in the record. As has been pointed out, the evidence on the matter of damages was "undisputed," and this is the matter as to which the alleged misconduct or error was directed. Also, the evidence in favor of plaintiff on the subject of contributory negligence could accurately be described as "overwhelming." The testimony indicating defendant's negligence also appears to be clear and convincing.

The majority decision here is entirely out of line with the California decisions dealing with misconduct of counsel. Thus, in the following cases the ruling of the trial court in denying

a new trial on the ground of misconduct of counsel was not disturbed upon appeal, although the instances of alleged misconduct as set forth below are far more serious than the actions of plaintiff's attorney in this case:

During the trial plaintiff's attorney read the contents of incompetent (hearsay) documents in the presence of the jury. (*Robinson* v. *Western States Gas & Elec. Co., supra,* 184 Cal. 401, 407; see, also, *Lafargue* v. *United Railroads, supra,* 183 Cal. 720.) Defendant's counsel, in a personal injury action, repeatedly got before the jury the idea that their side had an eyewitness to the accident who saw the plaintiff run in front of the train, although such a witness was never produced. (*Rather* v. *City & County of San Francisco,* 81 Cal.App.2d 625, 637 [184 P.2d 727].) Counsel for the plaintiff habitually mispronounced the defendant's name during the trial and in the course of argument referred to plaintiff as an American boy, the inference being that counsel was purposely trying to prejudice the jury against a man with a foreign name. (*Porter* v. *Granich,* 136 Cal.App. 523, 531 [29 P.2d 220]; see, also, *Spear* v. *Leuenberger,* 44 Cal. App.2d 236 [112 P.2d 43].) In his opening statement in an action for assault and battery, the attorney for the plaintiffs referred to the defendants as desperadoes, racketeers, cattle gangsters and drunken brutes. (*Deevy* v. *Tassi,* 21 Cal.2d 109, 121-122 [130 P.2d 389]; see, also, *McCabe* v. *Cheseldine,* 117 Cal.App. 526 [4 P.2d 282].) Defendants' counsel, in arguing to the jury, accused plaintiff's attorney of refusing to settle the case because of his wish to receive a large fee. In his opening statement plaintiff's attorney had stated that "we have sued for $15,000." The verdict was in favor of plaintiff for $600, although the injuries were serious. (*Johnson* v. *McRee,* 66 Cal.App.2d 524, 529-530 [152 P.2d 526]; see, also, *Fintel* v. *Engelbrecht,* 28 Cal.App.2d 23 [81 P.2d 1044].) In an action against a contractor for personal injuries sustained by an employee of the Bureau of Reclamation during the construction of a dam, there were repeated references by plaintiff's attorney to the fact that the contractor held a $35,000,000 contract to construct the dam. (*Miller* v. *Pacific Constructors, Inc.,* 68 Cal.App.2d 529, 551-553 [157 P.2d 57]; see, also, *Alberts* v. *Lytle,* 1 Cal.App.2d 682, 691-692 [37 P.2d 705].) Plaintiff's counsel made statements which tended to suggest to the jury that plaintiff was impoverished and without means, where there was no evidence of such poverty. (*Hodge* v. *Weinstock, Lubin & Co.,* 109 Cal.

App. 393, 401-403 [293 P. 80]; see, also, *Oakes* v. *Baker*, 85 Cal.App.2d 168 [192 P.2d 460].) The attorney for plaintiff represented to the jury in his opening statement the existence of facts (that defendant corporation's equipment was old and obsolete, undermanned, and without proper safeguards) which plaintiff was prepared to prove, but which plaintiff did not attempt to prove and which he allegedly knew at the time could not be proved. (*Mudrick* v. *Market Street Ry. Co.*, 11 Cal.2d 724, 737-738 [81 P.2d 950, 118 A.L.R. 533]; see ,also, *Adylott* v. *Key System Transit Co.*, 104 Cal.App. 621 [286 P. 456].) In his closing argument counsel for plaintiff, without any basis in the evidence, painted defendant company as accustomed to callously trying to "beat" claims of its patrons by such means as subjecting them to the expense of lawsuits, influencing witnesses by suggestion and confusing evidence, and the use of political influence. (*Jonte* v. *Key System*, 89 Cal.App.2d 654 [201 P.2d 562]; see, also, *Girard* v. *Irving*, 97 Cal.App. 377 [275 P. 840].) In discussing the testimony of a police officer who had been a witness for the plaintiff, defendant's attorney referred to police scandals not connected with the case. (*Woebbe* v. *Sperry*, 48 Cal.App.2d 340, 344 [119 P.2d 743]; see, also, *Walters* v. *Evick*, 93 Cal.App. 1, 15-16 [268 P. 1061].) In an action on promissory notes to which the defense of fraud was interposed, counsel for defendants repeatedly referred to the verdict of the jury in another case finding the procurer of the notes guilty of fraud, although the judgment in that case had been reversed. (*Liberty Bank* v. *Nonnenmann*, 96 Cal.App. 478, 487-488 [274 P. 568]; see, also, *Draper* v. *Hellman Com. T. & S. Bank*, 203 Cal. 26, 40-41 [263 P. 240]; *Weddle* v. *Loges*, 52 Cal.App. 2d 115, 123 [125 P.2d 914].)

Comparing the majority decision with the following criminal cases dealing with the misconduct of prosecuting attorneys as set forth below in which judgments of conviction were affirmed, it seems that the life and liberty of the defendants in those cases was not as highly valued as are the funds of defendant corporation here:

In the course of his case the prosecuting attorney called out the name of defendant's wife as a witness, although he was aware that she had not been subpoenaed and he had no intention of doing so. Also, in his argument to the jury, the prosecuting attorney made repeated references to the defendant's failure to call his wife as a witness, stating that

she was present when the events in question took place. (*People* v. *Klor,* 32 Cal.2d 658, 662-664 [197 P.2d 705].) Defendant, a Negro, was tried before an all Negro jury. In his opening statement the district attorney referred to race prejudice and stated, in effect, that the jury should convict the defendant if they wanted to avoid public criticism for favoring a defendant of their own race. (*People* v. *Fisher,* 86 Cal.App.2d 24, 32-33 [194 P.2d 116]; see, also, *People* v. *Macias,* 77 Cal. App.2d 71, 88-89 [174 P.2d 895].) The district attorney, in arguing to the jury that the death sentence should be imposed in a murder case, said that if the defendant were sentenced to life imprisonment he would probably be paroled in ten or twelve years and intimated that the penal institutions were very crowded so that paroles were granted without regard to merit in order to provide space for incoming prisoners. (*People* v. *Caetano,* 29 Cal.2d 616, 619-620 [177 P.2d 1].) The closing argument of the district attorney contained references to the defendants as ''gamblers,'' ''ex-convicts,'' ''gangsters,'' and statements to the effect that the county should be protected from such people. (*People* v. *Brancato,* 83 Cal. App.2d 734, 740-742 [189 P.2d 504].)

It is evident from defendant's briefs that its real complaint is directed to the giving of the instruction naming the amount of the prayer. From the citation of cases in the majority opinion dealing with misconduct of the trial judge (*Berguin* v. *Pacific Elec. Ry. Co.,* 203 Cal. 116 [263 P. 220]; *People* v. *Mahoney,* 201 Cal. 618 [258 P. 607]; *People* v. *Robinson,* 73 Cal.App.2d 233 [166 P.2d 17]; *Steele* v. *Wardwell,* 57 Cal. App.2d 642 [135 P.2d 628]; *People* v. *Frank,* 71 Cal.App. 575 [236 P. 189]) and the giving of erroneous instructions (*Clement* v. *State Reclamation Board,* 35 Cal.2d 628 [220 P.2d 897]; *Intagliata* v. *Shipowners & Mer. etc. Co.,* 26 Cal.2d 365 [159 P.2d 1]; *Oettinger* v. *Stewart,* 24 Cal.2d 133 [148 P.2d 19, 156 A.L.R. 1221]; *People* v. *Dail,* 22 Cal.2d 642 [140 P.2d 828]; *Pipoly* v. *Benson,* 20 Cal.2d 366 [125 P.2d 482, 147 A.L.R. 515]; *People* v. *Williams,* 17 Cal. 142; *Bollenbach* v. *United States,* 326 U.S. 607 [66 S.Ct. 402, 90 L.Ed. 350]; *Starr* v. *United States,* 153 U.S. 614 [14 S.Ct. 919, 38 L.Ed. 841]), it is apparent that the majority consider this instruction to be improper and a ground for reversal of the judgment, especially in view of the fact that the jury would not have learned of the granting of the motion but for this instruction.

The law of California has long been settled to the contrary. The propriety of such an instruction was upheld in *Lahti* v.

*McMenamin,* 204 Cal. 415, 421 [268 P. 644], and the following comments are pertinent here:

"Defendant suggests a number of circumstances happening during the trial which, he contends, had the effect of improperly influencing the jury to render the verdict in the amount specified, and which he claims is excessive. The first of these was an instruction of the court to the effect that the jury might, after considering all the elements contributing to plaintiff's damage, 'resolve what sum will fairly compensate her for the injury and loss, if any, sustained by her; *not exceeding, however, the amount prayed for in the complaint, to-wit, sixteen thousand three hundred and twelve and 10/100 ($16,312.10) dollars.'* That portion of the instruction italicized is the portion to which defendant particularly objects. An instruction of this character is usually given in negligence cases, and it is difficult to understand how a jury in such cases can be properly instructed by the court without employing language similar to that used by the court in the instruction complained of. There could be no error, therefore, in so instructing the jury. *If the defendant desired the jury further instructed to the effect that the amount named therein did not necessarily furnish any criterion for the amount of their verdict, it was his duty to ask for such qualifying instruction, and not having done so he cannot be heard to complain that it was not given."* (Emphasis added.) (See, also, *Blanton* v. *Curry,* 20 Cal.2d 793 [129 P.2d 1]; *McNulty* v. *Southern Pacific Co., supra,* 96 Cal.App.2d 841, 852-853, and cases cited; *Powers* v. *Shelton,* 74 Cal.App.2d 757, 765-766 [169 P.2d 482]; cases collected in 2 A.L.R.2d 459, 461.)

Here, assuming that the instruction naming the amount of plaintiff's claim, as amended, was capable of being misinterpreted in view of the other instructions on the matter of liability and damages, the defendant, not having requested a clarification of the instruction, is in no position to complain of the lack thereof at this time. An instruction to the effect that the amount of the prayer was merely a claim, and not evidence, would have been proper and, presumably, would have been given if requested. (See California Jury Instructions, Civil, Instructions 173 et seq.; *Eastlick* v. *City of Los Angeles,* 29 Cal.2d 661, 673-674 [177 P.2d 558, 170 A.L.R. 225].)

The precise contention raised here was expressly rejected

in *Buswell* v. *City & County of San Francisco,* 89 Cal.App.2d 123, 134 [200 P.2d 115], where it was said:

"The second point brings up the question of whether the court should mention to the jury the amount sued for. *It is contended that by so doing the judge in effect is telling the jury that in the particular case he believes that the evidence warrants a finding that any sum within the amount sued for would be reasonable to award as damages.* Many judges do not mention the sum sued for. Others do. In *Hollinger* v. *York Rys. Co.,* 225 Pa. 419 [74 A. 344, 17 Ann.Cas. 571], the practice of mentioning the amount is condemned. On the other hand, B.A.J.I., page 198 states: 'It is thought by some that the amount of damages alleged in the complaint should not be stated to the jury in the instructions. The editorial committee feel that this is largely a matter of discretion with each judge in each case. However, it is the opinion of a majority of the committee that there is no sound reason why the judge should not state the amount claimed. *Counsel may do so, and usually do.* We believe that the intended effect of the instruction is made more certain by a frank statement of the amount claimed. A noticeable avoidance of that fact might arouse curiosity. It may well be doubted that a defendant ever is injured by an instruction as here suggested. On the other hand, we feel certain that there have been cases when a defendant was helped by a jury's impression that the plaintiff filed an exorbitant claim. Such a result, however, is plaintiff's own harvest.' Assuming that the Hollinger case states the better practice, we cannot say that in California the mentioning of the amount sued for is error." (Emphasis added.)

Similarly, in *Norfolk & Western Ry. Co.* v. *Earnest,* 229 U.S. 114 [33 S.Ct. 654, 57 L.Ed 1096], an action under the Federal Employer's Liability Act involving the doctrine of comparative negligence, an instruction was given to the effect that, if the verdict was for the plaintiff, he should be awarded "such an amount of damages, not exceeding $20,000" as would compensate him for the injury. The prayer was for the sum stated. Rejecting the argument that this instruction "erroneously conveyed to the jury an intimation that a finding that the plaintiff's damages amounted to $20,000 was justified by the evidence," the court stated (p. 120) : "Looking at the entire paragraph we think it could not have been understood by the jury as conveying such an intimation, and that the words now criticized could only have been understood as

marking a limit beyond which the jury could not go.'' (See, also, *Chesapeake & Ohio Ry. Co.* v. *Carnahan,* 241 U.S. 241, 244-245 [36 S.Ct. 594, 60 L.Ed. 979]; *Dowell, Inc.* v. *Jowers,* 182 F.2d 576, 580; *Ritzman* v. *Mills,* 102 Cal.App. 464, 468 et seq. [283 P. 88].)

The instruction questioned by the defendant in *Eastlick* v. *City of Los Angeles, supra,* 29 Cal.2d 661, 673, was as follows: ''The amount of damages alleged in the complaint to have been suffered by plaintiff is $8,895.00. This allegation is merely a claim and is not evidence and must not be considered by you as evidence. It does, however, fix a maximum limit and you are not permitted to award plaintiff more than that amount.'' The complaint was amended at the trial to conform to the proof. As amended, it alleged items of damage for injuries caused by the defendant's negligence totalling $7,385 (general damages of $5,000 and special damages of $2,385), but the prayer was changed to $8,895. The defendant maintained that the amount stated in the instruction should have been the total sum of the items of alleged damages ''rather than the inflated figure of the prayer.'' In reply to this contention, it was said (p. 674): ''Regardless of the merit of defendant's objection, which properly should have been made in the trial court so that the discrepancy could have been there obviated (*Lahti* v. *McMenamin,* 204 Cal. 415, 421 [268 P. 644]), no harm appears to have resulted from the inaccuracy in the instruction. The verdict was for $5,000, well within the figure conceded by defendant to represent the limit of plaintiff's total demand.'' (See, also, *Sonstelie* v. *Bush,* 102 Cal.App. 396, 399-400 [283 P. 336].) It is noteworthy that the defendant's counsel in that case did not consider it worthwhile to argue that it was improper to instruct the jury accurately as to the amount of plaintiff's claims, as amended.

*Blanton* v. *Curry, supra,* 20 Cal.2d 793, 806, was an action to recover damages for personal injuries sustained by the plaintiffs when struck by an automobile driven by defendant Curry. It was held not to be prejudicial error for the trial court to instruct the jury, ''by way of explanation and example,'' that the judgment in the case might be for $10,000 against Curry, the driver, but could be for only $5,000 against Koehler, the owner of the car, unless it was found that Koehler was the principal and Curry was the agent, in which case there was no such limitation as to Koehler. The jury returned

a verdict of $10,000 against each of the defendants. (It does not appear whether the jury accomplished its task within a 35-minute period.) Certainly such an instruction is more pregnant with possibilities of prejudice than is the one given in the present case.

I am unable to see any distinction of substance between the Lahti case and the situation presented here. It is a common practice for the attorney for the plaintiff to state to the jury the amount of his claim and I am not aware that that practice has ever been questioned. (See *Johnson* v. *McRee, supra,* 66 Cal.App.2d 524, 530; *Ritzman* v. *Mills, supra,* 102 Cal.App. 464, 472; California Jury Instructions, Civil, p. 198.) Under the Lahti case it is also proper for the court to instruct the jury as to the amount of the prayer. If the plaintiff states his claim in his opening statement the jury will learn from the instructions whether or not an amendment to the prayer has been allowed during the trial, regardless of whether the motion to amend is made in the presence or absence of the jury. A distinction based upon the latter factor is a distinction without a difference. The only possible conclusion to be derived from the majority opinion is that Lahti and similar cases are to be overruled *sub silentio.* Apparently, the Pennsylvania rule is to be adopted to the effect that it is reversible error for plaintiff's counsel (*Carothers* v. *Pittsburgh Rys. Co.,* 229 Pa. 558 [79 A. 134]; *Quinn* v. *Philadelphia Rapid Transit Co.,* 224 Pa. 162 [73 A. 319]; *Vaughan* v. *Magee,* 218 F. 630; see *Porter* v. *Zeuger Milk Co.,* 136 Pa.Super. 48 [7 A.2d 77]) or the trial court (*Hollinger* v. *York Rys. Co.,* 225 Pa. 419 [74 A. 344, 17 Ann.Cas. 571]; *Reese* v. *Hershey,* 163 Pa. 253 [29 A. 907, 43 Am.St.Rep. 795]) to state to the jury the amount of damages claimed in a negligence action, despite the established law and practice in this state to the contrary. Thus, the majority opinion cites with apparent approval the case of *Vaughan* v. *Magee, supra,* which states and follows the Pennsylvania rule.

The New York cases cited by defendant deal with the propriety of allowing amendments to the complaint during the trial and therefore they are not in point. The basis of the decision in *Kenney* v. *South Shore Natural Gas & Fuel Co.,* 126 App.Div. 236 [110 N.Y.S. 503], is illustrated by the following comments in the opinion: "It seems that the court on the trial of an action may, in the proper exercise of its discretion, permit plaintiff to amend his complaint by increasing the amount of damages demanded. (Citations.) Al-

though the exercise of this power of the trial court has received frequent recognition and approval, *we do not think such an amendment can properly be permitted simply upon plaintiff's motion, unsupported by any suggestion explaining why application for the privilege had not previously been made at Special Term, or excusing the apparent laches in not earlier presenting such application.* Even if application had been made at Special Term for the desired amendment, some reason showing the propriety of the amendment at that time would have been required or the motion would have been properly denied. . . .

"We do not now assume to pass upon the question whether the plaintiff on proper application may not be entitled to such an amendment; *but hold simply that, as the case is now presented to us, the motion was improperly granted* and the verdict therefore unwarranted." (Emphasis added.) The dissenting opinion advanced the view that the allowance of the amendment increasing the damage claim was within the discretion of the trial court.

It is apparent that the decision in that case was not based upon misconduct of counsel or the giving of erroneous instructions, but upon the ground that an amendment to the complaint should not be allowed during the trial unless the plaintiff states sufficient reasons why the amendment was not requested at an earlier time when the facts were known to him. That it is within the discretion of the trial court to grant a motion to amend the complaint at the close of the plaintiff's case, as was done here, cannot be seriously questioned in this state. As has been shown, the California practice is to liberally allow such amendments and the trial court's exercise of its discretion in this matter will rarely be disturbed upon appeal.

*Sandresky* v. *Erie R. Co.,* 91 Misc. 67 [153 N.Y.S. 612], also involves the propriety of granting leave to amend since it appears that the plaintiff therein was permitted to amend his complaint by increasing the damage claim *at the opening of the trial.* The trial court's action at that time could not possibly support an inference that the judge believed a higher verdict was warranted.

*Pfeil* v. *Klein,* 247 App.Div. 510 [286 N.Y.S. 721], cites and follows the Kenney and Sandresky cases and the language used in the opinion indicates that it is based upon the same point.

In *Sawyer* v. *Munson S. S. Line,* 7 F.Supp. 193, the Kenney case is cited for the following proposition: "Motion to increase

the amount of damages should not be made at the trial of the action, but should be made in advance of the trial."

It is true that there are statements in the Kenney and Pfeil cases to the effect that an application for leave to increase the amount of the prayer should not be made in the presence of the jury. However, there seems to be some doubt in New York as to whether the jury should ever be informed or instructed in any manner as to the amount of unliquidated damages claimed by the plaintiff. (See, apparently applying the Pennsylvania rule, *Gilbertson* v. *Forty-Second St. etc. Ry. Co.*, 14 App.Div. 294 [43 N.Y.S. 782, 784]; *Rost* v. *Brooklyn Heights R. Co.*, 10 App.Div. 477 [41 N.Y.S. 1069, 1072-1073]; *Wersebe* v. *Broadway & S.A.R. Co.*, 1 Misc. 472 [21 N.Y.S. 637].)

Decisions merely stating that the motion to amend was not made in the presence of the jury (as in *Buswell* v. *City & County of San Francisco, supra,* 89 Cal.App.2d 123, 133; *Sohman* v. *Metropolitan St. Ry. Co.*, 56 Misc. 342 [106 N.Y.S. 1033]; *Walker* v. *Bradt*, 225 App.Div. 415 [233 N.Y.S. 388]; *Prichard* v. *Dubinsky*, 338 Mo. 360 [89 S.W.2d 530]; *Hinchliffe* v. *Wenig Teaming Co.*, 274 Ill. 417 [113 N.E. 707]) obviously do not provide any support for the majority decision here.

The wild charges directly or inferentially made by defendant of "recklessness in advocacy," "deliberate and gross misconduct" which was "deliberately designed to mislead and prejudice the jury," "vicious practice," and "fraud and deceit" on the part of plaintiff's attorney are entirely without foundation in the record. Neither does the reproduction of false, misleading and sensationalized newspaper articles in its petition for hearing add anything at all to the legal sufficiency of defendant's argument. Such tactics suggest that defendant's counsel believes this court to be incapable of determining the importance of the points made without the "assistance" of newspaper reporters.

We have here nothing more than a routine motion and a customary instruction. I see no misconduct in the making of the motion and no error in the instruction. I cannot understand how the combination of the two factors results in reversible error under any circumstances, unless, as heretofore suggested, the majority believe that the Pennsylvania rule should be adopted in this state, making the amount of damages claimed a sacred subject, not to be touched upon by counsel or the court. Equally fanciful, yet finding support in the

opinion of the majority here, would be the argument that the granting of a motion to amend the complaint in other respects to conform to the proof during the trial, as where a new or different cause of action or issue is injected into the case, constitutes reversible error on the ground that this suggests to the jury that the trial judge believes the evidence warrants the plaintiff's recovery under the amendment.

In my opinion there was no error or misconduct in the trial court and the judgment should be affirmed.

Respondent's petition for a rehearing was denied April 12, 1951. Gibson, C. J., Carter, J., and Traynor, J., voted for a rehearing.